JUDGE JONES                09 CV 8067

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
THE ESTATE OF VASILIJS GERASIMENKO
and LARISA GERASIMENKO,

                                    Plaintiffs,          09 CV 8067 (BSJ)

        -v-
                                                         **VERIFIED COMPLAINT**
CAPE WIND TRADING COMPANY,
LSC SHIPMANAGEMENT LTD., and
LATVIAN SHIPPING COMPANY a/k/a
JSC LATVIJAS KUGNIECIBA,

                                    Defendants.
-------------------------------------------------------------------x

        Plaintiffs, THE ESTATE OF VASILIJS GERASIMENKO (hereinafter "VASILIJS

GERASIMENKO") and LARISA GERASIMENKO, by and through attorneys, CHALOS &

CO, P.C., as and for its Verified Complaint against Defendants, CAPE WIND TRADING

COMPANY (hereinafter "CAPE WIND"), LSC SHIPMANAGEMENT LTD. (hereinafter

"LSC"), and LATVIAN SHIPPING COMPANY a/k/a JSC LATVIJAS KUGNIECIBA

(hereinafter "LATVIAN SHIPPING"), alleges upon information and belief as follows:

<u>JURISDICTION</u>

        1.      The Court has subject matter jurisdiction by virtue that the underlying claim

herein is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules

of Civil Procedure and within the admiralty and maritime jurisdiction of this Court under 28

U.S.C. § 1333.

<u>THE PARTIES</u>

        2.      At all times material hereto, Plaintiff, VASILIJS GERASIMENKO, was a foreign

person domiciled in a foreign country and was a worker aboard the M/V INDRA.

3.      At all times material hereto, Plaintiff, LARISA GERASIMENKO is a foreign person domiciled in Riga, Latvia.

4.      At all times material hereto, Defendant, LATVIAN SHIPPING, is a foreign business entity.

5.      At all times material hereto, Defendant, CAPE WIND, is a foreign business entity duly organized and existing pursuant to the laws of Liberia, with a principal place of business at 171 Old Bakery Str., Monrovia VLT09, Liberia.

6.      At all times material hereto, Defendant, LSC, was and still is a foreign business entity.

7.      At all times material hereto, Defendant, LATVIAN SHIPPING, was and still is a foreign business entity.


## FACTS AND CLAIM

8.      On or about July 28, 2007, VASILIJS GERASIMENKO, entered into an employment contract with Defendants, CAPE WIND, LSC, and LATVIAN SHIPPING, relating to the M/T INDRA ("the Vessel"). *See Contract of Employment and Collective Fleet Agreement, attached hereto as Exhibit 1.*

9.      Defendant, CAPE WIND, is the registered owner of the Vessel. *See Equasis Report, attached hereto as Exhibit 2.*

10.     Defendant, LSC, is the ship manager of the Vessel. *See Equasis Report, attached hereto as Exhibit 2.*

11.     Defendant, LATVIAN SHIPPING, is the group owner of the Vessel. *See print-out of LATVIAN SHIPPING website, attached hereto as Exhibit 3.*

12.     Plaintiff, VASILIJS GERASIMENKO was employed by Defendants as the Second Engineer aboard the Vessel.

13.     Pursuant to the terms and conditions of Clause 22 of the Collective Fleet Agreement ("CFA"), the parties agreed that "A seafarer shall be entitled to immediate medical attention when required . . . . A seafarer who is hospitalized abroad owing to sickness or injury shall be entitled to medical attention (including hospitalization) at the Company's expense for as long as such attention is required or until the seafarer is repatriated to the port of engagement. . ."

14.     The M/V INDRA arrived in Corpus Christi, Texas, on August 25, 2008.  At this time members of the crew commenced repair work in the engine room of the Vessel.

15.     All repair work was performed exclusively by the members of the crew, without the contractually necessary periods of rest.  The temperature in the engine room was measured to be as high as 70°C (158°F) near the engine.

16.     Plaintiff, VASILIJS GERASIMENKO worked in these extreme conditions from 6:00 p.m. August 25, 2008 through 5:00 a.m. August 27, 2008, with little to no periods of rest.

17.     Immediately after completion of the repair work, VASILIJS GERASIMENKO made the crew members aware that he felt unwell, and at 7:45 a.m. an ambulance evacuated Plaintiff from the Vessel.

18.     At 8:28 a.m. on August 27, 2008, VASILIJS GERASIMENKO was pronounced dead.  The cause of death was listed as hyperthermia due to working in hot environment (engine room of ship). *See Certificate of Death, attached hereto as Exhibit 4.*

19.     Due to the gross negligence and willful failure on the part of Defendants to provide safe working conditions and appropriate rest periods, VASILIJS GERASIMENKO died in Corpus Christi Texas, August 27, 2008.

20.    As a result of the Defendants' willful breach of the Employment Contract, the Plaintiffs have suffered losses for the wrongful death of Plaintiff, VASILIJS GERASIMENKO.

21.    Despite due demand, the Defendants have failed to provide security for the Plaintiffs claims.

22.    Pursuant to the terms and conditions of Clause 26 and Appendix 3 of the CFA, the parties further agreed that "If a Seafarer dies through any cause whilst in the employment of the Company including death from natural causes and death occurring whilst travelling to and from the vessel, . . . the Company shall pay the sums specified in . . . Appendix 3 to a nominated beneficiary." Plaintiffs' damages under Clause 26 and Appendix 3 have therefore been assessed as USD $89,100.00.

23.    Plaintiff, VASILIJS GERASIMENKO, was the sole financial support for his family. Plaintiff, LARISA GERASIMENKO was unemployed at the time of death, and remains unemployed. LARISA GERASIMENKO, is therefore entitled to the future wages which would be earned by VASILIJS GERASIMENKO.

24.    At the moment of VASILIJS GERASIMENKO's death, he was a fifty-one (51) year old man, with eleven (11) years (132 months) left until retirement. His monthly wage pursuant to the Contract of Employment was USD $7,400.00. Accordingly, over a period of eleven (11) years, VASILIJS GERASIMENKO would have earned USD $976,800.00.

25.    Additionally, LARISA GERASIMENKO is entitled to further damages, including loss of benefits, pain and suffering, grief, and loss of companionship. Accordingly, LARISA GERASIMENKO is entitled to damages estimated to be an amount no less than USD $200,000.00.

26.    This action is brought in order to obtain security and to prosecute Plaintiff's claims as against Defendants.

27.    As best as can now be estimated, Plaintiffs expect to recover the following amounts in from Defendants:

|  |  |  |
|---|---|---|
| A. | Principal claim: | $1,265,900.00 |
| B. | Estimated interest on Principal claim:<br>3 years at 7.5%, compounded quarterly | $316,115.96 |
|  | **Total Claim** | **$ 1,582,015.96** |

28.    Therefore, Plaintiffs' total claim against Defendants is in the aggregate USD $1,582,015.96.

<u>BASIS FOR ATTACHMENT</u>

29.    Defendants cannot be found within this district within the meaning of Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, but Defendants are believed to have or will have during the pendency of this action, certain assets, accounts, freights, monies, charter hire, credits, effects, payment for bunkers, goods or services, bills of lading, cargo and the like belonging to, claimed by, or for the benefit of, the Defendants within this District held by various parties, as garnishees, including by not limited to electronic fund transfers.

30.    Defendants are continuously engaged in international shipping and conduct business in U.S. Dollars.  Nearly all companies engaged in the international shipping industry transact business in U.S. Dollars and therefore regularly have assets in New York City.  Dollars are the *lingua franca* of international commerce.

31.    All international U.S. dollar transfers are processed by intermediary banks in the United States, mainly in New York City.  The Clearing House Interbank Payment System represents that it processes 95% of those transfers.

32.    Plaintiffs believe that some of these assets of Defendants, to wit: accounts; bank accounts; monies; charter hire; credits; debts owed to the defendants; effects; payments for bunkers, cargo, goods or services; debts; unmatured debts; bills of lading; payments from the purchasers of cargoes; freight and/or hire payments to or from owners of vessels, or charterers, to, from, or for the benefit of, Defendants and/or Clearing House Interbank Payment System (CHIPS) credits or funds being transferred through intermediary banks, are located in this District in the possession of garnishees, including: ABN AMRO BANK, American Express Bank, Bank of America, Bank of China, Bank of New York, Bank of Tokyo Mitsubishi UFJ Ltd., Barclay's Bank, BNP Paribas SA, Calyon, Calyon Financial, Inc., Citibank N/A, Credit Suisse Securities (USA) LLC, Deutsche Bank, HSBC (USA), JPMorgan Chase Bank, Mashreqbank, Societe Generale, Standard Chartered Bank, UBS AG, U.S. Bank, Wachovia Bank,  and Wells Fargo Bank.

WHEREFORE, Plaintiffs pray:

A.    That process in due form of law issue against the Defendants, citing them to appear and answer under oath all, and singular, the matters alleged in the Verified Complaint;

B.    That since the Defendants cannot be found within the District, as set forth in the Declaration of George M. Chalos (*attached hereto as Exhibit 5*), and pursuant to Rule B and Rule E of the Supplemental Rules of Certain Admiralty and Maritime Claims, this Court issue an Order directing the Clerk of Court to issue Process of Maritime Attachment and Garnishment pursuant to Rule B and Rule E of the Supplemental Rules for Certain Admiralty and Maritime Claims, attaching all of the Defendants tangible or intangible property or any other funds held by

any garnishees in the district which are due and owing, or other property of, or for the benefit of, the Defendants, up to the amount of USD $1,582,015.96 to secure and satisfy the Plaintiffs' claims, and that all persons claiming any interest in the same be cited to appear and pursuant to Supplemental Admiralty Rule B and Rule E answer the matters alleged in the Complaint;

C.    That Plaintiffs may have such other, further and different relief as may be just and proper.

Dated: Oyster Bay, New York
       September 21, 2009

                                    CHALOS & CO, P.C.
                                    Attorneys for Plaintiffs
                                    THE ESTATE OF VASILIJS GERASIMENKO
                                    and LARISA GERASIMENKO

                        By:    _____
                                    George M. Chalos (GC-8693)
                                    123 South Street
                                    Oyster Bay, New York 11771
                                    Tel: (516) 714-4300
                                    Fax: (516) 750-9051
                                    Email: gmc@chaloslaw.com

# EXHIBIT 1

## SEAMAN'S EMPLOYMENT CONTRACT (SEC) CREW, CADETS, REPAIR SPECIALISTS

SEC signed  28.07.2008  and agreed to be effective from the date of seafarer's leaving Riga or his residence for vessel or date of completion the training on board in position B

| This SEC is entered into between the Seaman and the Owner of the Vessel (Employer) | **INDRA** |
|---|---|

### THE SEAMAN

| Surname | GERASIMENKO | Name: | VASILIJS |
|---|---|---|---|
| Full home address: | 10/8-14, OZOLCIEMA STR., RIGA, LATVIA | Identity No: | 250857-10627 |
| Position | ENGINEER OFFICER (2ND ENGINEER) | Medical certificate issued on: | 07.12.2006 |
| Nationality. | LATVIAN | Passport No: | LZ2068167 | Seaman's book No | 0245694 |

### THE EMPLOYER

| Name | CAPE WIND TRADING COMPANY |
|---|---|
| Address | 171, OLD BAKERY STR.,MONROVIA VLT09, LIBERIA |

### THE VESSEL

| Name | INDRA | Official No: | 9721 |
|---|---|---|---|
| Flag | LIBERIA | Port of registry: | MONROVIA |

### NOMINATED BENEFICIARY (Collective Fleet Agreement Article 26)

| Relationship: | WIFE | Surname: | GERASIMENKO | Name: | LARISA | ID: | 140555-10639 |
|---|---|---|---|---|---|---|---|

### TERMS OF THE CONTRACT

| Period of employment:  4 +/-1 MONTHS | Wages from and including the date of seafarer's leaving Riga or his residence for vessel or date of completion the training in position B | Hours of work: 8 per day Monday to Friday |
|---|---|---|
| Basic monthly wage:  $ 1,695.00 | Consolidated OT rate crew only:  $ 1,260.00  OT rate per hour:  — (for crew in excess of 103 hours / for cadets' max OT 70 hours / for repair team max OT 103 hours) | Leave pay 8 days:  $ 451.00 |
| Subsistence allowance on leave:  $ 144.00 | Tanker allowance:  $ 400.00 | Trade allowance:  $ 2,550.00 |
| License allowance: | Return bonus:  $ 300.00 | Total wage:  $ 7,400.00 |
| Market allowance:  $ 300.00 | Company bonus:  $ 300.00 | |

1.  The current ITF Collective Agreement shall be considered to be incorporated into and to form part of this contract.
2.  The Ship's Articles shall be deemed for all purposes to include the terms of this Contract (including the ITF Collective Agreement) and it shall be the duty of the Employer to ensure that the Ship's Articles reflect these terms. These terms shall take precedence over all other terms.
3.  The ITF may vary the terms and conditions of the ITF Collective Agreement from time to time. Terms and Conditions as so varied shall from part of this Contract with effect from the date of the Variation in place of Terms and Conditions current immediately preceding the Variation.

### CONFIRMATION OF THE CONTRACT

| Signature and stamp of Employer: SIA LSC SHIPMANAGEMENT AS AGENT ONLY ON BEHALF OF THE OWNER | Signature of Seaman: |
|---|---|
| | |

# COLLECTIVE FLEET AGREEMENT

*Concluded between*

## LSC SHIPMANAGEMENT SIA

acting on behalf of the owners of the vessels listed in this agreement
(as may be amended as necessary)

*and the*

## LATVIAN SEAFARERS' UNION OF MERCHANT FLEET, Riga

An affiliated union of the
**International Transport Workers' Federation (ITF), London**

**Riga, January 2008**

## LIST OF VESSELS

| VESSEL | CREW ONBOARD |
| --- | --- |
| 1. MV DUBULTI | 20 |
| 2. MV PUMPURI | 20 |
| 3. MV MAR | 20 |
| 4. MV ZOJA I | 20 |
| 5. MV INGA | 20 |
| 6. MV BULDURI | 20 |
| 7. MV ASARI | 20 |
| 8. MV ESTERE | 20 |
| 9. MV INDRA | 20 |
| 10. MV ROPAŽI | 21 |
| 11. MV ĶEMERI | 21 |
| 12. MV OJĀRS VĀCIETIS | 21 |
| 13. MV ŽANIS GRĪVA | 21 |
| 14. MV DZINTARI | 21 |
| 15. MV KOLKA | 18 |
| 16. MV KALTENE | 18 |
| 17. MV KULDĪGA | 18 |
| 18. MV ANCE | 18 |
| 19. MV JŪRKALNE | 18 |
| 20. MV PUZE | 18 |
| 21. MV TĀRGALE | 18 |
| 22. MV UGĀLE | 18 |
| 23. MV USMA | 18 |
| 24. MV PILTENE | 18 |
| 25. MV UŽAVA | 18 |
| 26. MV SALACGRĪVA | 18 |
| 27. MV AINAŽI | 18 |
| 28. MV KRĀSLAVA | 18 |
| 29. MV KANDAVA | 18 |
| 30. MV KAZDANGA | 18 |
| 31. MV KRIŠJĀNIS VALDEMĀRS | 18 |
| 32. MV AKADĒMIĶIS ZAVARICKIS | 17 |
| 33. MV AKADĒMIĶIS VAVILOVS | 17 |
| 34. MV SKULPTORS TOMSKIS | 17 |
| 35. MV AMATA | 17 |
| 36. MV ABAVA | 17 |

# COLLECTIVE FLEET AGREEMENT

## Article 1: Application

1.1    This IBF Collective Fleet Agreement sets out the terms and conditions applicable to all seafarers serving on the ships listed herein. This Collective Fleet Agreement consists of the main part of the Agreement, Appendix 1 List of National Holidays, Appendix 2 containing the agreed wage scale, Appendix 3 Compensation Payments.

1.2    This Agreement is deemed to be incorporated into and to contain the terms and conditions of employment of any seafarer to whom this Agreement applies whether or not the Company has entered into an individual Contract of Employment with the seafarer.

1.3    It is understood and agreed that nothing contained in this Agreement is intended to or shall be construed as to restrict in any way the authority of the Master.

1.4    The IBF Special Agreement requires the Company, inter alia to employ the seafarers on the terms and conditions of an ITF approved agreement, and to enter into individual contracts of employment with any seafarer to whom this Agreement applies, incorporating the terms and conditions of an ITF approved Agreement. The Company undertakes that it will comply with all the terms and conditions of this Agreement.

1.5    The words "seafarer", "ship", IBF Special Agreement', "Union", "ITF" and "company" when used in this Agreement shall have the same meaning as in the IBF Special Agreement. Furthermore, "seafarer" refers to each seafarer to whom this Agreement applies.

1.6    Each seafarer, shall be covered by the Agreement with effect from the date on which they are engaged, whether they have signed Articles or not, until the date on which they sign off and/or the date until which, in accordance with this Agreement, the Company is liable for the payment of wages, whether or not any employment contract is executed between the seafarer and the Company and whether or not the Ship's Articles are endorsed or amended to include the rates of pay specified in this Agreement.

## Article 2: Pre-Employment

2.1    Each seafarer shall undertake to serve the Company competently and shall undertake that they possess, and will exercise, the skill commensurate with the certificates that they declare to hold.

2.2    The Company shall be entitled to require that any seafarer shall have a satisfactory pre-employment medical examination, at Company expense, by a Company-nominated doctor and that the seafarer answer faithfully any questionnaire on their state of health, which may be required. Failure to do so may effect the seafarer's entitlement to compensation as per Articles 22,23,24, 25 and 26. The seafarer shall be entitled to receive a copy of the medical certificate issued in respect of such an examination.

2.3    Companies who are direct employers or who use seafarers recruitment and placement services shall ensure, as far as practicable, that the standards laid down in the MLC are met including the requirement that no fees or visa are borne directly or indirectly, in whole or in part, by the seafarers for finding employment, the right for seafarers to inspect their employment agreements before engagement and preventing the recruitment or placement services from

2

using means, mechanisms or lists to prevent seafarers from gaining employment for which they are qualified.

2.4     Each seafarer shall sign the seamen's employment contract attached as Appendix 4.

### Article 3: Probationary Service

3.1     The first 6 weeks of service during the first term of employment with the Company shall be regarded as probationary and both the seafarer and/or the Company shall be entitled to terminate the employment prior to the expiry of the contract during this period. In such event the cost of repatriation shall be the responsibility of the party who gives notice of termination but the compensation for premature termination of employment provided shall not apply.

### Article 4: Non-Seafarers Work

4.1     Neither ship's crews nor anyone else on board whether in permanent or temporary employment by the Company shall be required or induced to carry out cargo handling and other work traditionally or historically done by dock workers without the prior agreement of the ITF Dockers Union or Unions concerned and provided that the individual seafarers volunteer to carry out such duties, for which they should be adequately compensated. For the purpose of this clause "cargo handling" may include but is not limited to: loading, unloading, stowing, unstowing, pouring, trimming, classifying, sizing, stacking, unstacking as well as composing and decomposing unit loads; and also services in relation with cargo or goods, such as tallying, weighing, measuring, cubing, checking, receiving, guarding, delivering, sampling and sealing, lashing and unlashing.

4.2     Where a vessel is in a port where an official trade dispute involving an ITF-affiliated dock workers' union is taking place, neither ship's crew nor anyone else on board whether in permanent or temporary employment by the Company shall be instructed or induced to undertake cargo handling and other work, traditionally and historically done by members of that union which would affect the resolution of such a dispute. The company will not take any punitive measures against any seafarer who respects such dock workers' trade dispute and any such lawful act by the seafarer shall not be treated as any breach of the seafarer's contract of employment, provided that this act is lawful within the country it is taken.

4.3     For crewmembers compensation for such work performed during the normal working week, as specified in Article 6, shall be by the payment of the overtime rate specified in APPENDIX 2 for each hour or part hour that such work is performed, in addition to the basic pay. Any such work performed outside the normal working week will be compensated at double the overtime rate.

### Article 5: Duration of Employment

5.1     A seafarer shall be engaged for 4 (four) or 5 (five) months and such period may be extended or reduced by 1 (one) month for operational convenience. The employment shall be automatically terminated upon the terms of this Agreement at the first arrival of the ship in port after expiration of that period, or of any other period specified in the Employment Contract, unless the company operates a permanent employment system or unless an extension of that period is mutually agreed.

### Article 6: Hours of Duty

6.1    The normal hours of duty shall be eight hours per day from Monday to Friday totalling 40 hours per week (173 hours per month).

### Article 7: Overtime

7.1    Entitlement to overtime for all seafarers shall be as follows:-

The officers are compensated for hours worked in excess of the ordinary hours by a monthly consolidated overtime as stipulated in column B of the attached wages scale calculation.
The ratings receive an overtime allowance as stipulated in column B of the wages scale calculation which covers guaranteed overtime of 103 hours per month. Overtime in excess of 103 hours will be paid in accordance with the rates listed in column C of the attached wages scale calculation.

7.2    Overtime shall be recorded individually and in duplicate either by the Master or the Head of the Department.

7.3    Such record shall be handed to the seafarer for approval every month or at shorter intervals. Both copies must be signed by the Master and/or Head of the Department as well as by the seafarer, after which the record is final. One copy shall be handed over to the seafarer.

7.4    Any additional hours worked during an emergency directly affecting the immediate safety of the ship, its passengers, crew or cargo, of which the Master shall be the sole judge, or for safety drills or work required to give assistance to other ships or persons in immediate peril shall not count for overtime payment.

### Article 8: Holidays

8.1    For the purpose of this Agreement the days listed in Appendix 1 shall be considered as holidays at sea or in port. If a holiday falls on a Saturday or a Sunday, the following working day shall be observed as a holiday.

### Article 9: Rest of Periods

9.1    Each seafarer shall have a minimum of 10 hours rest in any 24-hour period and 77 hours in any seven-day period.

9.2    This period of 24 hours shall begin at the time a Seafarer starts work immediately after having had a period of at least 6 consecutive hours off duty.

9.3    The hours of rest may be divided into no more than two periods, one of which shall be at least 6 hours in length, and the interval between consecutive periods of rest shall not exceed 14 hours.

9.4    The Company shall post in an accessible place on board a table detailing the schedule of service at sea and in port and the minimum hours of rest for each position on board in the language of the ship and in English.

4

9.5 Nothing in this Article shall be deemed to impair the right of the Master of a ship to require a seafarer to perform any hours of work necessary for the immediate safety of the ship, persons on board or cargo, or for the purpose of giving assistance to other ships or persons in distress at sea. In such situations, the Master may suspend the schedule of hours of work or hours of rest and require a seafarer to perform any hours of work necessary until the normal situation has been restored, the Master shall ensure that any seafarers who have performed the work in a scheduled rest period are provided with an adequate period of rest. In addition, the STCW requirements covering overriding operational conditions shall apply.

9.6 A short break of less than 30 minutes will not be considered as a period of rest.

9.7 Emergency drills and drills prescribed by national laws and regulations and by international instruments shall be conducted in a manner that minimises the disturbance of rest periods and does not induce fatigue.

9.8 The allocation of periods of responsibility on UMS Ships, where a continuous watchkeeping in the engine room is not carried out, shall also be conducted in a manner that minimises the disturbance of rest periods and does not induce fatigue and an adequate compensatory rest period shall be given if the normal period of rest is disturbed by call-outs.

9.9 Records of seafarers daily hours of rest shall be maintained to allow for monitoring of compliance with this Article.

## Article 10: Wages

10.1 The wages of each seafarer shall be calculated in accordance with this Agreement and as per the attached wage scale (APPENDIX 2 and APPENDIX 2A) and the only deductions from such wages shall be proper statutory and other deductions as recorded in this Agreement and/or other deductions as authorised by the seafarer.

10.2 The seafarer shall be entitled to payment of their net wages, after deductions, in US dollars, or in currency agreed with seafarers, at the end of each calendar month together with an account of their wages, identifying the exchange rate where applicable.

10.3 Any wages not drawn by the seafarer shall accumulate for their account and may be drawn as a cash advance twice monthly.

10.4 For the purpose of calculating wages, a calendar month shall be regarded as having 30 days.

10.5 No seafarer employed in the Deck or Engine departments who is 21 or over and is not a trainee shall be paid less than the equivalent rate of an ordinary seaman.

### Article 11: Allotments

Each seafarer to whom this Agreement applies shall be allowed an allotment note, payable at monthly intervals, of up to 80% of basic wages after allowing for any deductions as specified in Article 10.

### Article 12: Leave

Each seafarer shall, on the termination of employment for whatever reason, be entitled to payment of leave pay of 8 (eight) days per month for each completed month of service and pro rata for a shorter period.

### Article 13: Subsistence Allowance

When food and/or accommodation is not provided on board, the Company shall be responsible for providing food and/or accommodation of suitable quality.

### Article 14: Watchkeeping

14.1    Watchkeeping at sea and, when deemed necessary, in port, shall be organised where possible on a three-watch basis.

14.2    It shall be at the discretion of the Master which seafarers are put into watches and which, if any, on daywork.

14.3    While watchkeeping at sea, the officer of the navigational watch shall be assisted by a posted lookout during the hours of darkness and as required by any relevant national and international rules and regulations, and, in addition, whenever deemed necessary by the master or officer of the navigational watch.

14.4    The Master and Chief Engineer shall not normally be required to stand watches

### Article 15: Manning

The Ship shall be competently and adequately manned so as to ensure its safe operation and the maintenance of a three-watch system whenever required and in no case manned at a lower level than in accordance with relevant and applicable international laws, rules and regulations.

15.1    In addition, the manning of each ship shall be determined following agreement between the Company and the Union with whom the agreement is concluded.

15.2    The agreed manning shall not include any temporary or riding squad workers.  However, in certain circumstances, the company and the union can agree that for a limited period temporary riding squads may be used on board subject to the following principles:

-    persons engaged for security purposes should not undertake other seafarers' duties;
-    only specific tasks authorised by the Master can be carried out by the riding squads;
-    classification societies are to be informed of any survey or structural work carried out in compliance with IACS UR Z13;

6

- all riding squads must be covered by agreements in line with ILO conventions and recommendations; and
- riding squads should not be used to replace current crew or to be used to permanently undermine ITF agreements.

## Article 16: Shorthand Manning

16.1 Where the complement falls short of the agreed manning, for whatever reasons, the basic wages of the shortage category shall be paid to the affected members of the concerned department. Every effort shall be made to make good the shortage before the ship leaves the next port of call. This provision shall not affect any overtime paid in accordance with Article 7.

## Article 17: Service in Warlike Operations Areas

17.1 A warlike operations area shall be determined by the IBF Warlike Operations Areas Committee in accordance with the Committee's Rules and Procedures.

17.2 During the assignment a seafarer shall be given full information of the war zone's inclusion in the ship's trading pattern and shall have the right not to proceed to a warlike operations area, in which event the seafarer shall be repatriated at Company's' cost with benefits accrued until date of return to the port of engagement.

17.3 Where a ship enters into an area where warlike operations take place, the seafarer will be paid a bonus equal to 100% of the basic wage for the duration of the ship's stay in such area subject to a minimum of five days' pay. Similarly, the compensation for disability and death shall be doubled.

17.4 A seafarer shall have the right to accept or decline the assignment without risking losing their employment or suffering any other detrimental effects.

## Article 18: Crew's Effects

18.1 When any seafarer suffers total or partial loss of, or damage to, their personal effects whilst serving on board the ship as a result of wreck, loss stranding or abandonment of the vessel, or as a result of fire, flooding or collision, excluding any loss or damage caused by the seafarer's own fault or through theft or misappropriation, they shall be entitled to receive from the Company compensation up to a maximum specified in APPENDIX 3.

18.2 The seafarer shall certify that any information provided with regard to lost property is true to the best of their knowledge.

18.3 The company shall take measures for safeguarding property left on board by sick, injured or deceased seafarers and for returning it to them or to their next of kin.

### Article 19: Termination of Employment

19.1  The employment shall be terminated:

a)  upon the expiry of the agreed period of service identified in Article 5;

b)  when signing off owing to sickness or injury, after medical examination in accordance with Article 22, but subject to the provision of Article 26.

19.2  The Company may terminate the employment of a seafarer:

a)  by giving one month's written notice to the seafarer;

b)  on the misconduct or incompetence of the seafarer in accordance with Article 21.

c)  upon the total loss of the ship, or when the ship has been laid up for a continuous period of at least one month or upon the sale of the ship.

19.3  A seafarer to whom this Agreement applies may terminate a current employment contract:

a)  by giving one month's written notice of termination to the Company or the Master of the ship;

b)  when, during the course of a voyage it is confirmed that the wife or, in the case of a single person, a parent, has fallen dangerously ill. This provision shall also be applied with regard to the partner of a seafarer provided that this partner has been nominated by the seafarer at the time of engagement as the seafarers next of kin;

c)  if the ship is about to sail into a warlike operations area, in accordance with Article 17 of this Agreement;

d)  if the seafarer was employed for a specified voyage on a specified ship, and the voyage is subsequently altered substantially, either with regard to duration of trading pattern;

e)  if the Ship is certified substandard in relation to the applicable provisions the Safety of Life at Sea Convention (SOLAS) 1974, the International Convention on Loadlines (LL) 1966, the Standards of Training Certification and Watchkeeping Convention (STCW) 1995, the International Convention for the Prevention of Pollution from Ships 1973, as modified by the Protocol of 1978 (MARPOL) or substandard in relation to ILO Convention No. 147, 1976, Minimum Standards in Merchant Ships as supplemented by the Protocol of 1996 and remains so for a period of 30 consecutive days provided that adequate living conditions and provisions are provided on board or ashore. In any event, a Ship shall be regarded as substandard if it is not in possession of the certificates required under either applicable national laws and regulations or international instruments;

f)  if the ship has been arrested and has remained under arrest for 30 days;

g)  if after any agreed grievance procedure has been invoked, the Company has not complied with the terms of this Agreement;

19.4  A seafarer shall be entitled to receive compensation of two months' basic pay on termination of their employment in accordance with 19.2(a) and (c), 19.3(c), (d), (e), (f) and (g) above and Article 24.1.

19.5  It shall not be grounds for termination if, during the period of the agreement, the Company transfers the seafarer to another vessel belonging or related to the same owner/manager, on the same rank and wages and all other terms, if the second vessel is engaged on the same or similar voyage patterns. There shall be no loss of earnings or entitlements during the transfer and the Company shall be liable for all costs and subsistence for and during the transfer.

## Article 20: Repatriation

20.1  Repatriation shall take place in such a manner that it takes into account the needs and reasonable requirements for comfort of the seafarer.

20.2  During repatriation for normal reasons, the Company shall be liable for the following costs:

a)  payment of basic wages between the time of discharge and the arrival of the seafarer at their place of original engagement or home;

b)  the cost of maintaining the seafarer ashore until repatriation takes place;

c)  reasonable personal travel and subsistence costs during the travel period;

d)  transport of the seafarer's personal effects up to the amount allowed free of charge by the relevant carrier.

20.3  A seafarer shall be entitled to repatriation at the Company's expense on termination of employment as per Article 19 except where such termination arises under Clause 19.2(b) and 19.3(a).

## Article 21: Misconduct

21.1  The Company may terminate the employment of a seafarer following an act of misconduct or incompetence which gives rise to a lawful entitlement to dismissal, provided that the Company shall, where possible, prior to dismissal, give written notice to the seafarer specifying the misconduct or incompetence which has been the cause of the dismissal.

21.2  The Company shall ensure that a fair, effective and expeditious on-board procedure is in place to deal with reports of misconduct and with seafarers complaints or grievances. The procedures shall allow seafarers to be accompanied or represented during the procedure and provide safeguards against victimization for raising complaints that are not manifestly vexatious or malicious.

9

21.3  In the event of the dismissal of a seafarer in accordance with this clause, the Company shall be entitled to recover from that seafarer's balance of wages the costs involved with repatriating the seafarer together with such costs incurred by the Company as are directly attributable to the seafarers proven misconduct. Such costs do not, however, include the costs of providing a replacement for the dismissed seafarer.

21.4    For the purpose of this Agreement, refusal by any seafarer to obey an order to sail the ship shall not amount to misconduct of the seafarer where:

a)    the ship is unseaworthy or otherwise substandard as defined in Clause 19.3 e);

b)    for any reason it would be unlawful for the ship to sail;

c)    the seafarer has a genuine grievance against the Company in relation to the implementation of this Agreement and has complied in full with the terms of the Company's grievance procedure, or

d)    the seafarer refuses to sail into a warlike area.

## Article 22: Medical Attention

22.1    A seafarer shall be entitled to immediate medical attention when required.

22.2    A seafarer who is hospitalised abroad owing to sickness or injury shall be entitled to medical attention (including hospitalisation) at the Company's expense for as long as such attention is required or until the seafarer is repatriated to the port of engagement, whichever is the earlier.

22.3    A seafarer repatriated to their port of engagement, unfit as a result of sickness or injury, shall be entitled to medical attention (including hospitalisation) at the Company's expense:

a)    in the case of sickness, for up to 130 days after repatriation, subject to the submission of satisfactory medical reports.

b)    in the case of injury, for so long as medical attention is required or until a medical determination is made in accordance with clause 25.2 concerning permanent disability.

22.4    Proof of continued entitlement to medical attention shall be by submission of satisfactory medical reports, endorsed.

## Article 23: Sick Pay

23.1    When a seafarer is landed at any port because of sickness or injury payment of their basic wages shall continue until they have been repatriated at the Company's expense as specified in Article 20.

23.2    Thereafter the seafarers shall be entitled to sick pay at the rate equivalent to their basic wage while they remain sick up to a maximum of 130 days.
The seafarer shall be entitled to payment of their sick wages at the end of each calendar month subject to timely submission of a medical report to the Company.

23.3    However, in the event of incapacity due to an accident the basic wages shall be paid until the injured seafarer has been cured or until a medical determination is made in accordance with clause 25.2 concerning permanent disability.

23.4    Proof of continued entitlement to sick pay shall be by submission of satisfactory medical reports, endorsed, where necessary, by a Company appointed doctor. If a doctor appointed by or on behalf of the seafarer disagrees with the assessment, a third doctor may be nominated jointly between the Company and the Union and the decision of this doctor shall be final and binding on both parties.

## 24: Maternity

24.1    In the event that a crewmember becomes pregnant during the period of employment:

a)    the seafarer shall advise the master as soon as the pregnancy is confirmed;

b)    the Company will repatriate the seafarer as soon as reasonably possible but in no case later than the 26th week of pregnancy; and where the nature of the vessel's operations could in the circumstances be hazardous – at the first port of call.

c)    the seafarer shall be entitled to 100 days basic pay.

d)    the seafarer shall be afforded priority in filling a suitable vacancy in the same or equivalent position within three years following the birth of a child should such a vacancy be available.

## Article 25: Disability

25.1    A seafarer who suffers permanent disability as a result of an accident whilst in the employment of the Company regardless of fault, including accidents occurring while travelling to or from the ship, and whose ability to work as a seafarer is reduced as a result thereof, but excluding permanent disability due to wilful acts, shall in addition to sick pay, be entitled to compensation according to the provisions of this Agreement.

25.2    The disability suffered by the seafarer shall be determined by a doctor appointed by the Company.  If a doctor appointed by or on behalf of the seafarer disagrees with the assessment, a third doctor may be nominated jointly between the Company and the Union and the decision of this doctor shall be final and binding on both parties.

25.3    The Company shall provide disability compensation to the seafarer in accordance with APPENDIX 3, with any differences, including less than 10 % disability, to be pro rata.

25.4    A seafarer whose disability, in accordance with 25.2 above is assessed at 50% or more shall, for the purpose of this paragraph, be regarded as permanently unfit for further sea service in any capacity and be entitled to 100% compensation. Furthermore, any seafarer assessed at less than 50 % disability but certified as permanently unfit for further sea service in any capacity by the Company-nominated doctor, shall also be entitled to 100 % compensation. Any disagreement as to the assessment or entitlement shall be resolved in accordance with clause 25.2 above.

25.5    Any payment effected under 25.1 to 25.4 above, shall be without prejudice to any claim for compensation made in law, but may be deducted from any settlement in respect of such claims.

25.6 Shipowners, in discharging their responsibilities to provide for safe and decent working conditions, should have effective arrangements for the payment of compensation for personal injury. When a claim arises, payment should be made promptly and in full, and there should be no pressure by the shipowner or by the representative of the insurers for a payment less than the contractual amount due under this Agreement. Where the nature of the personal injury makes it difficult for the shipowner to make a full payment of the claim, consideration to be given to the payment of an interim amount so as to avoid undue hardship.

### Article 26: Loss of Life – Death in Service

26.1 If a Seafarer dies through any cause whilst in the employment of the Company including death from natural causes and death occurring whilst travelling to and from the vessel, or as a result of marine or other similar peril, but excluding death due to wilful acts, the Company shall pay the sums specified in the attached APPENDIX 3 to a nominated beneficiary and to each dependent child up to a maximum of 4 (four) under the age of 18. The Company should also transport at its own expense the body to Seafarer's home where practical and at the families' request and pay the cost of burial expenses. If the Seafarer shall leave no nominated beneficiary, the aforementioned sum shall be paid to the person or body empowered by law or otherwise to administer the estate of the Seafarer.

26.2 Any payment effected under this clause shall be without prejudice to any claim for compensation made in law but may be offset against any such payments.

26.3 For the purpose of this clause a seafarer shall be regarded as "in the employment of the company" for so long as the provisions of Articles 22 and 23 apply and provided the death is directly attributable to sickness or injury that caused the seafarer's employment to be terminated in accordance with Article 19.1 b).

26.4 The provisions of Article 25.6 above shall also apply in the case of compensation for Loss of Life – Death in Service as specified in this Article.

### Article 27: Insurance Cover

27.1 The Company shall conclude appropriate insurance to cover themselves fully against the possible contingencies arising from the Articles of this Agreement.

27.2 The additional cost to the Company for obtaining insurance cover for the enhanced levels of death and disability compensation agreed by the IBF is recognised as an allowance under the heading D&D in the attached wages scales.

### Article 28: Food, Accommodation, Bedding, Amenities etc.

28.1 The Company shall provide, as a minimum, accommodation, recreational facilities and food and catering services in accordance with the standards specified in Title 3 to the draft ILO Consolidated Maritime Labour Convention and shall give due consideration to the Guidelines in that Convention.

28.2 Seafarers will have access to free calls on a one-off basis linked to compassionate circumstances as per Article 19.3 emergencies.

## Article 29: Personal Protective Equipment

29.1 The Company shall provide the necessary personal protective equipment in accordance with ISM/IMO regulations, or any applicable national regulations that specify any additional equipment, for the use of each seafarer while serving on board.

29.2 The Company will supply the crew with appropriate personal protective equipment for the nature of the job.

29.3 Seafarers should be advised of the dangerous nature and possible hazards of any work to be carried out and instructed of any necessary precautions to be taken as well as of the use of the protective equipment.

29.4 If the necessary safety equipment is not available to operate in compliance with any of the above regulations, seafarers should not be permitted or requested to perform the work.

29.5 Seafarers should use and take care of personal protective equipment at their disposal and not misuse any means provided for their own protection or the protection of others. Personal protective equipment remains the property of the Company.

## Article 30: Shipboard Safety Committee

30.1 The Company shall facilitate the establishment of an on board Safety and Health Committee, in accordance with the provisions contained in the ILO Code of Practice on Accident Prevention on Board Ship at Sea and in Port, and as part of their safety-management system as per the requirements of the ISM Code.

30.2 The Company shall provide a link between the Company and those on board through the designation of a person or persons ashore having direct access to the highest level of management as per the requirements of the ISM Code. The Company shall also designate an on board competent safety Officer who shall implement the Company's safety and health policy and program and carry out the instructions of the Master to:

a) improve the crew's safety awareness; and

b) investigate any safety complaints brought to her/his attention and report the same to the Safety and Health Committee and the individual, where necessary; and

c) investigate accidents and make the appropriate recommendations to prevent the recurrence of such accidents; and

d) carry out safety and health inspections.

30.3 The Company acknowledges the right of the crew to elect a safety representative to the on board Safety and Health Committee. Such a representative shall be entitled to the same protections as the liaison representative as provided for in 31.5 below.

## Article 31: Membership Fees, Welfare Fund and Representation of Seafarers

31.1 The Company undertakes not to engage seafarers who are not covered by the present agreement.

31.2 The Company agrees to deduct from the seafarers wages the membership fees payable to the Union which are currently 1% (one per cent) of the gross wages per month for both Officers and Ratings and remit same. In the case of seafarers who are not members of the Union Company shall deduct the 1% of gross wages as a negotiation fee and remit this amount to the Union.

31.3 The Company shall pay contributions to the ITF Seafarers' International Assistance, Welfare and Protection Fund in accordance with the terms of the Special Agreement.

31.4 The Company acknowledges the right of seafarers to participate in union activities and to be protected against acts of anti-union discrimination as per ILO Conventions Nos. 87 and 98.

31.5 The Company acknowledges the right of the seafarers to elect a liaison representative from among the crew who shall not be dismissed nor be subject to any disciplinary proceedings as a result of the seafarer's duties as a liaison representative unless the Union has been given adequate notice of the dismissal and the agreed Grievance procedure has been observed.

## Article 32: Equality

32.1 Each seafarer shall be entitled to work, train and live in an environment free from harassment and bullying whether sexually, racially or otherwise motivated. The Company will regard breaches of this undertaking as a serious act of misconduct on the part of seafarers.

## Article 33: Waivers and Assignments

33.1 The Company undertakes not to demand or request any seafarer to enter into any document whereby, by way of waiver or assignment or otherwise, the seafarer agrees or promises to accept variations to the terms of this Agreement or return to the Company, their servants or agents any wages (including backwages) or other emoluments due or to become due to the seafarer under this Agreement and the Company agrees that any such document already in existence shall be null and void and of no legal effect.

## Article 34: Training Allowance

34.1 The additional "Training Allowance" specified in the wages scales is allowed towards training costs of the company for the seafarers to conform with the IMO requirements in respect of the STCW convention. This amount shall not be payable to the seafarers.

## Article 35: Date of Application

35.1 The IBF Framework TCC Agreement shall take effect with effect from 1 January 2008 and shall remain in effect until 31 December 2009.

35.2 The Agreement is gone into abeyance for one (or some) of vessels pointed put in the ADDENDUM I if and effective from the moment when:
a) a vessel(s) is sold;
b) a vessel(s) is scrapped;
c) a vessel's flag is changed to Latvian.

35.3 Should both parties agree on any amendment or addition to this Agreement, such additions or amendments shall be agreed in writing and signed by both parties and incorporated in the Agreement, being also notified to ITF for approval.

## 36.  Dispute Procedure

36.1 Any dispute that may arise between the parties in relation to the present Agreement shall be solved by mutual good faith negotiations of the parties. In case mutual negotiations fail to reach the agreement within one month, dispute shall be referred to arbitration under the IBF Disputes Procedure. The parties shall not perform any activities of unilateral character during the course of negotiations or dispute solutions procedure.

Signed
for LSC Shipmanagement

...............................
**M.Ekbaums**
Chairman of board

Date

Signed
for Latvian Seafarers Union
Of Merchant Fleet

...............................
**I.Pavlovs**
President

Date

APPENDIX 1
Holidays

The days regarded as holidays in accordance with Article 8 shall be:- 24th,25th, 26th December, 31 December, New Years Day, Good Friday, Easter, Easter Monday, 1 May (Labour Day), 4 May (Declaration of Independence), 23, 24 June (Midsummer), 18 November (Independence Day).


APPENDIX 3
Compensation Payments

Crew's Effects
Maximum compensation for loss of effects as provided for in Article 18 of this Agreement shall be US$3,000.

Disability
In the event a seafarer suffers permanent disability in accordance with the provisions of Article 25 of this Agreement, the scale of compensation provided for under Article 25.3 shall be:

| | Degree of Disability | | Rate of Compensation |
|---|---|---|---|
| % | Ratings | Junior Officers | Senior Officers (4) |
| 100 | 89100 | 118800 | 148500 |
| 75 | 66825 | 89100 | 111375 |
| 60 | 53460 | 71280 | 89100 |
| 50 | 44550 | 59400 | 74250 |
| 40 | 35640 | 47520 | 59400 |
| 30 | 26730 | 35640 | 4450 |
| 20 | 17820 | 23760 | 29700 |
| 10 | 8910 | 11880 | 14850 |

Note: "Senior Officers" for the purpose of this clause means Master, Chief Officer, Chief Engineer and 2nd Engineer.

Loss of Life – Death in Service
Death in service benefits as provided in Article 26 of this Agreement shall be:

To the nominated beneficiary
$89100

To each dependant child (maximum 4 under the age of 18)
$17820

APPENDIX

## year 2008 minimum wage scale

| Rank | Basic | o.t/month | o.t. rate | leave8 | leave sub. | Wage¹ | allowance | Wage² | Funding elements | | | Total cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | Social I | Training J | D&D K | L |
| MASTER | 2590 | 1928 | | 691 | 144 | | 500 | | 35 | 65 | 20 | |
| C/O | 1695 | 1260 | | 451 | 144 | | 400 | | 35 | 65 | 20 | |
| 2/O | 1300 | 967 | | 347 | 144 | | 300 | | 35 | 65 | 20 | |
| 3/O | 1097 | 816 | | 293 | 144 | | 275 | | 35 | 65 | 20 | |
| C/ENG | 2400 | 1786 | | 640 | 144 | | 450 | | 35 | 65 | 20 | |
| 2/ENG | 1695 | 1260 | | 451 | 144 | | 400 | | 35 | 65 | 20 | |
| GAS/ENG | 1790 | 1332 | | 477 | 144 | | | | 35 | 65 | 20 | |
| REF/ENG | 1383 | 1029 | | 369 | 144 | | 370 | | 35 | 65 | 20 | |
| EL/ENG | 1433 | 1066 | | 382 | 144 | | 350 | | 35 | 65 | 20 | |
| 3/ENG | 1300 | 967 | | 347 | 144 | | 300 | | 35 | 65 | 20 | |
| 4/ENG | 1097 | 816 | | 293 | 144 | | 275 | | 35 | 65 | 20 | |
| BOSUN | 789 | 587 | 5.7 | 210 | 144 | | 110 | | 35 | 40 | 20 | |
| P/MAN | 789 | 587 | 5.7 | 210 | 144 | | 110 | | 35 | 40 | 20 | |
| FITTER | 789 | 587 | 5.7 | 210 | 144 | | 110 | | 35 | 40 | 20 | |
| SEN.AB | 750 | 558 | 5.4 | 200 | 144 | | 100 | | 35 | 40 | 20 | |
| AB | 737 | 548 | 5.3 | 197 | 144 | | 100 | | 35 | 40 | 20 | |
| OS | 540 | 402 | 3.9 | 144 | 144 | | 70 | | 35 | 40 | 20 | |
| M/MAN | 737 | 548 | 5.3 | 197 | 144 | | 100 | | 35 | 40 | 20 | |
| WIPER | 540 | 402 | 3.9 | 144 | 144 | | 70 | | 35 | 40 | 20 | |
| COOK | 789 | 587 | 5.7 | 210 | 144 | | 110 | | 35 | 40 | 20 | |
| STWD | 737 | 548 | 5.3 | 197 | 144 | | 100 | | 35 | 40 | 20 | |
| MESSBOY | 540 | 402 | 3.9 | 144 | 144 | | 70 | | 35 | 40 | 20 | |

Wage¹ - for reefer vessels/dry cargo
Wage² - for tankers/gas carriers

Glenn T. Pavlous

17

APPENDIX

## year 2008 minimum wage scale

| Rank | Basic | o.t./month | o.t. rate | leave8 | leave sub. | Wage¹ | allowance | Wage² | Social | Training | D&D | Total cost |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | A | B | C | D | E | F | G | H | I | J | K | L |
| MASTER | 2590 | 1928 | | 691 | 144 | 5353 | 500 | 5853 | 35 | 65 | 20 | 5973 |
| C/O | 1695 | 1260 | | 451 | 144 | 3550 | 400 | 3950 | 35 | 65 | 20 | 4070 |
| 2/O | 1300 | 967 | | 347 | 144 | 2758 | 300 | 3058 | 35 | 65 | 20 | 3178 |
| 3/O | 1097 | 816 | | 293 | 144 | 2350 | 275 | 2625 | 35 | 65 | 20 | 2745 |
| C/ENG | 2400 | 1786 | | 640 | 144 | 4970 | 450 | 5420 | 35 | 65 | 20 | 5540 |
| 2/ENG | 1695 | 1260 | | 451 | 144 | 3550 | 400 | 3950 | 35 | 65 | 20 | 4070 |
| GAS/ENG | 1790 | 1332 | | 477 | 144 | 3743 | 400 | 4413 | 35 | 65 | 20 | 4233 |
| REF/ENG | 1383 | 1029 | | 369 | 144 | 2925 | 370 | 3375 | 35 | 65 | 20 | 3045 |
| EL/ENG | 1433 | 1066 | | 382 | 144 | 3025 | 350 | 3375 | 35 | 65 | 20 | 3495 |
| 3/ENG | 1300 | 967 | | 347 | 144 | 2758 | 300 | 3058 | 35 | 65 | 20 | 3178 |
| 4/ENG | 1097 | 816 | | 293 | 144 | 2350 | 275 | 2625 | 35 | 65 | 20 | 2745 |
| BOSUN | 789 | 587 | 5.7 | 210 | 144 | 1730 | 110 | 1840 | 35 | 40 | 20 | 1935 |
| P/MAN | 789 | 587 | 5.7 | 210 | 144 | 1730 | 110 | 1840 | 35 | 40 | 20 | 1935 |
| FITTER | 789 | 587 | 5.7 | 210 | 144 | 1730 | 110 | 1840 | 35 | 40 | 20 | 1935 |
| SEN. AB | 750 | 558 | 5.4 | 200 | 144 | 1652 | 100 | 1752 | 35 | 40 | 20 | 1847 |
| AB | 737 | 548 | 5.3 | 197 | 144 | 1626 | 100 | 1726 | 35 | 40 | 20 | 1821 |
| OS | 540 | 402 | 3.9 | 144 | 144 | 1230 | 70 | 1300 | 35 | 40 | 20 | 1395 |
| M/MAN | 737 | 548 | 5.3 | 197 | 144 | 1626 | 100 | 1726 | 35 | 40 | 20 | 1821 |
| WIPER | 540 | 402 | 3.9 | 144 | 144 | 1230 | 70 | 1300 | 35 | 40 | 20 | 1395 |
| COOK | 789 | 587 | 5.7 | 210 | 144 | 1730 | 110 | 1840 | 35 | 40 | 20 | 1935 |
| STWD | 737 | 548 | 5.3 | 197 | 144 | 1626 | 100 | 1726 | 35 | 40 | 20 | 1821 |
| MESSBOY | 540 | 402 | 3.9 | 144 | 144 | 1230 | 70 | 1300 | 35 | 40 | 20 | 1395 |

Wage¹ - for reefer vessels/dry cargo
Wage² - for tankers/gas carriers

18

## ADDENDUM 1

to the CFA between SIA "LSC SHIPMANAGEMENT" and Latvian Seafarers' Union
of Merchant Fleet valid from 01st January, 2008

### Social and Training Funds

The Parties agreed on the following:

a)  Social money 35 USD per position on board will be transferred by the
    Company to a special account of LSUMF on a monthly basis. The Union will
    be obliged to conclude an insurance agreement with the Latvian insurance
    company in order to provide all Seafarers employed by SIA "LSC
    SHIPMANAGEMENT" with insurance compensation in death, illness and
    disability cases while Seafarer are on leave (ashore).

b)  Training money 65 USD per Officer and 40 USD per Rating on board will be
    operated by the Company in order to meet the new requirements of
    STCW Convention.
    The parties also agreed to inform each other once per 6 months about what
    kind of privileges have been received for Seafarers according to this
    Agreement.


Signed
for LSC Shipmanagement

...................................
M.Ekbaums
Executive Director


Date


Signed
for Latvian Seafarers' Union
Of Merchant Fleet

...................................
I.Pavlovs
President


Date

## ADDENDUM II

to the CFA between SIA "LSC SHIPMANAGEMENT" and Latvian Seafarers' Union
of Merchant Fleet valid from 01st January, 2008

### Cadets

The parties have agreed on following:

1. For all cadets onboard the following CFA articles shall be applicable: 17, 22, 23, 25 and 26;

2. If a cadet is requested to work in excess of his normal working hours as stated in separate agreement between SIA "LSC SHIPMANAGEMENT" and cadet's respective maritime educational institution, overtime compensation at the rate of USD 4.0 per hour is applicable.

3. To introduce stipends for cadets as follow:

   - 225 USD per month for rating trainee;
   - 350 USD per month for cadets of Maritime College and the 1st level of Maritime Academy (1,2,3 courses students);
   - 450 USD per month for 2nd level cadets of Maritime Academy (4,5 courses students)

Signed
for LSC Shipmanagement

...............................
M.Ekbaums
Chairman of board

Date

Signed
for Latvian Seafarers' Union
Of Merchant Fleet

...............................
I.Pavlovs
President

Date

### ADDENDUM III

to the CFA between SIA "LSC SHIPMANAGEMENT" and Latvian Seafarers' Union
of Merchant Fleet valid from 01st January, 2008

#### Repairmen

The parties have agreed on following:

1. For all repairmen onboard the following CFA articles shall be applicable: 17, 22, 23, 25 and 26.

2. 1% of the total monthly wages earned by repairmen shall be deducted in favor of LSUMF according to the Article 31.2

Signed
for LSC Shipmanagement

.......................................
M.Ekbaums
Chairman of board

Date

Signed
for Latvian Seafarers' Union
Of Merchant Fleet

.......................................
I.Pavlovs
President

Date

**ADDENDUM IV**
to the CFA between SIA "LSC SHIPMANAGEMENT" and Latvian Seafarers' Union
of Merchant Fleet valid from 01st January, 2008

**Credit Card System**

The Parties have agreed that the Ship Owners provide for the payment of wages using an international credit card system.

At the same time:
1. All provisions of the Collective Fleet Agreement cover the ships' crews, minimum guaranteed wage scale for Latvian crews including.
2. Slopchest, personal telephone calls and telegraphs communications are ensured on board and their amount will be charged from basic monthly wages.
3. In addition the Ship Owner:
   3.1. undertakes responsibility to ensure of the money on the credit card account;
   3.2. ensures free withdrawal of cash for the seafarers and members of their families via the international network of Automatic Telemachines (ATM) and branches of the bank that is issued the credit cards;
   3.3. pays the bank commission for usage of the credit cards for cashless settlement.

Signed
for LSC Shipmanagement

..............................
M.Ekbaums
Chairman of board


Date

Signed
for Latvian Seafarers' Union
Of Merchant Fleet

..............................
I.Pavlovs
President


Date

# EXHIBIT 2

# Ship info

| | |
|---|---|
| **IMO number :** | 9065168 |
| **Name of ship :** | INDRA |
| **Call Sign :** | ELSP8 |
| **Gross tonnage :** | 21183 |
| **Type of ship :** | Chemical Tanker |
| **Year of build :** | 1994 |
| **Flag :** | Liberia |
| **Status of ship :** | In Service |
| **Last update :** | 2006-11-20 |

## ⊮ MANAGEMENT

| Company number | Role | Name of company | Address |
|---|---|---|---|
| 1652803 | Registered owner | CAPE WIND TRADING CO | Liberia |
| 1866320 | Ship manager | LSC SHIPMANAGEMENT SIA | 10A, Ganibu dambis, Riga Latvia |
| 1866320 | ISM Manager | LSC SHIPMANAGEMENT SIA | 10A, Ganibu dambis, Riga Latvia |

## ⊮ CLASSIFICATION SURVEYS

| Classification society | Date survey | Date next survey |
|---|---|---|
| Russian Maritime Register of Shipping | 2008-12-01 | 2013-12-22 |

## ⊮ SAFETY MANAGEMENT CERTIFICATE (IACS WHITE LIST)

| Classification society | Date survey | Date expiry | Date of status | Status | Reason | Type |
|---|---|---|---|---|---|---|
| Bureau Veritas | 2006-08-15 | 2011-10-12 | | | | Statutory |

## ⊮ P&I INFORMATION

| Name of P&I insurer | Date of inception |
|---|---|
| Assuranceforeningen Skuld - Norway | 2006-02-21 |

## ⊮ CONDITION ASSESSMENT SCHEME

| | |
|---|---|
| Does the vessel have a statement of compliance ? | Not applicable |

 Condition Assessment Scheme Q88

© Copyright 2000-2006; Version : prodPV_2_2_0; Developed and hosted by : France-Ministry for Transport -DAM/SI

EXHIBIT 3




LAT | ENG

THE COMPANY          Securities

FLEET                Articles of Assoction

RELATED              Financial Indicators
COMPANIES
                     Links
INFORMATION FOR
INVESTORS

CURRENT EVENTS

OPEN POSITIONS

## Tankers

Joint stock company *Latvijas kuģniecība* (JSC *Latvian Shipping Company*) provides a broad and diverse range of shipments, therefore our ships can be spotted in seas, oceans and at ports all over the world.

In the *handy* or *medium-sized* tankers' category, our tankers' fleet is one of the largest in the world. In the commercial managment of the JSC *Latvian Shipping Company* there are 29 tankers (including 3 tankers time chartered in from other shipowners) with tonnages ranging from 16 000 to 68 000 tonnes provided for safe shipments of oil products and chemicals. All tankers have received the ISM (International Safety Management) certificate. Most of the ships are ice-class.

Shipments of various oils, crude oil, light chemicals, dark and light oil products are carried out by these ships.



**Our ships will deliver your freight**

**to any port in the world**

**SAFELY and always ON TIME!**


Site map | Feedback | Contacts

developed by

## Fleet

| Name | Built | DWT (t) | Flag |
|---|---|---|---|
| **Indra** | | | |
| m.t. "INDRA" | 1994 | 33 115 | Liberia |
| **Kemeri** | | | |
| m.t. "OJARS VACIETIS" | 1985 | 17 160 | Liberia |
| **Riga** | | | |
| m.t. "RIGA" | 2001 | 68 467 | Latvia |
| **S** | | | |
| m.t. "ANCE" | 2006 | 52 600 | the Marshall Islands |
| m.t. "JURKALNE" | 2006 | 52 600 | the Marshall Islands |
| m.t. "PUZE" | 2006 | 52 600 | the Marshall Islands |
| m.t. "TARGALE" | 2007 | 52 600 | the Marshall Islands |

| | | | |
|---|---|---|---|
| m.t. "UGALE" | 2008 | 52 600 | the Marshall Islands |
| m.t. "USMA" | 2007 | 52 600 | the Marshall Islands |
| m.t. "PILTENE" | 2007 | 52 600 | the Marshall Islands |
| m.t. "UZAVA" | 2008 | 52 600 | the Marshall Islands |
| m.t. "SALACGRIVA" | 2008 | 52 600 | the Marshall Islands |
| m.t. "AINAZI" | 2008 | 52 600 | the Marshall Islands |
| **Talava** | | | |
| m.t. "ESTERE" | 1989 | 28 557 | Liberia |
| m.t. "INGA" | 1990 | 28 557 | Liberia |
| m.t. "MAR" | 1990 | 28 557 | Liberia |
| m.t. "PUMPURI" | 1987 | 28 610 | Liberia |
| m.t. "ZOJA 1" | 1988 | 28 557 | Liberia |
| m.t. "ZOJA II" | 1989 | 28 557 | Latvia |
| **Kolka** | | | |
| m.t. "KANDAVA" | 2007 | 37 258 | the Marshall Islands |
| m.t. "KRASLAVA" | 2007 | 37 258 | the Marshall Islands |
| m.t. "KAZDANGA" | 2007 | 37 258 | the Marshall Islands |
| m.t. "KOLKA" | 2003 | 37 211 | the Marshall Islands |
| m.t. "KULDIGA" | 2003 | 37 237 | the Marshall Islands |
| m.t. "KALTENE" | 2003 | 37 211 | the Marshall Islands |
| m.t. "KRIŠJĀNIS VALDEMĀRS" | 2007 | 37 258 | the Marshall Islands |

# EXHIBIT 4

DEPARTMENT OF STATE HEALTH SERVICES
VITAL STATISTICS UNIT

TEXAS DEPARTMENT OF STATE HEALTH SERVICES - VITAL STATISTICS
STATE OF TEXAS — CERTIFICATE OF DEATH

STATE FILE NUMBER  142-08-098421

| 1. LEGAL NAME OF DECEASED (Include AKA's if any) (First, Middle, Last) | | 2. DATE OF DEATH (ACTUAL OR PRESUMED) |
|---|---|---|
| VASILIUS GERASIMENKO | | 08/27/2008 |

| 3. SEX | 4. DATE OF BIRTH | 5. AGE-Last Birthday | 6. BIRTHPLACE (City & State or Foreign Country) |
|---|---|---|---|
| MALE | 08/25/1957 | 51 | UKRAINE |

| 7. SOCIAL SECURITY NUMBER | 8. MARITAL STATUS AT TIME OF DEATH | 9. SURVIVING SPOUSE'S NAME (If wife, give name prior to first marriage) |
|---|---|---|
| | ☒ Married | LARISA UNKNOWN |

| 10a. RESIDENCE-STREET ADDRESS | 10b. CITY OR TOWN |
|---|---|
| 10/8-14, OZOLCIEMA/STR. | RIGA |

| 10c. STATE | 10d. ZIP CODE | 10e. INSIDE CITY LIMITS? |
|---|---|---|
| | | ☒ Yes |

| 10f. COUNTY | |
|---|---|
| LATVIA | |

| 11. FATHER'S NAME | 12. MOTHER'S NAME (PRIOR TO FIRST MARRIAGE) |
|---|---|
| UNKNOWN UNKNOWN | UNKNOWN UNKNOWN |

13. PLACE OF DEATH (CHECK ONLY ONE)
IF DEATH OCCURRED IN A HOSPITAL: ☐ Inpatient ☒ ER/Outpatient ☐ DOA
IF DEATH OCCURRED SOMEWHERE OTHER THAN A HOSPITAL: ☐ Hospice Facility ☐ Nursing Home ☐ Decedent's Home ☐ Other (Specify)

| 14. COUNTY OF DEATH | 15. CITY/TOWN, ZIP | 16. HOSPITAL OR OTHER INSTITUTION-NAME (If not institution, give street address) |
|---|---|---|
| NUECES | CORPUS CHRISTI, 78404 | CHRISTUS SPOHN HOSPITAL SHORELINE |

| 17. INFORMANT'S NAME & RELATIONSHIP TO DECEASED | 18. MAILING ADDRESS OF INFORMANT (Street and Number, City, State, Zip Code) |
|---|---|
| JAMES BUCHANAN - ATTORNEY AT LAW | 800 N. SHORELINE BLVD. SUITE 300, CORPUS CHRISTI, TX 78401 |

| 18. METHOD OF DISPOSITION | 19. SIGNATURE AND LICENSE NUMBER OF FUNERAL DIRECTOR OR PERSON ACTING AS SUCH |
|---|---|
| ☐ Burial  ☐ Cremation  ☐ Donation  ☐ Entombment  ☒ Removal from State  ☐ Other (Specify) | JACK C. SAWYER, BY ELECTRONIC SIGNATURE - 6009 |

| 22. PLACE OF DISPOSITION (Name of cemetery, crematory, other place) | 23. LOCATION (City/Town, and State) |
|---|---|
| UNKNOWN | RIGA, LG |

| 24. NAME OF FUNERAL FACILITY | 25. COMPLETE ADDRESS OF FUNERAL FACILITY (Street and Number, City, State, Zip Code) |
|---|---|
| SAWYER-GEORGE FUNERAL HOME, INC. | 12497 LEOPARD ST, CORPUS CHRISTI, TX 78410 |

26. CERTIFIER (Check only one)
☐ Certifying physician-To the best of my knowledge, death occurred due to the cause(s) and manner stated.
☒ Medical Examiner/Justice of the Peace - On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date and place, and due to the cause(s) and manner stated.

| 27. SIGNATURE OF CERTIFIER | 28. DATE CERTIFIED (Mo/Day/Yr) | 29. LICENSE NUMBER | 30. TIME OF DEATH (Actual or presumed) |
|---|---|---|---|
| RAY FERNANDEZ, BY ELECTRONIC SIGNATURE | 08/29/2008 | H6924 | 08:28 AM |

| 31. PRINTED NAME, ADDRESS OF CERTIFIER (Street and Number, City, State, Zip Code) | 32. TITLE OF CERTIFIER |
|---|---|
| RAY FERNANDEZ, 2610 HOSPITAL BLVD, CORPUS CHRISTI, TX 78405 | MD |

33. PART I. ENTER THE CHAIN OF EVENTS - DISEASES, INJURIES, OR COMPLICATIONS - THAT DIRECTLY CAUSED THE DEATH. DO NOT ENTER TERMINAL EVENTS SUCH AS CARDIAC ARREST, RESPIRATORY ARREST, OR VENTRICULAR FIBRILLATION WITHOUT SHOWING THE ETIOLOGY. DO NOT ABBREVIATE. ENTER ONLY ONE CAUSE ON EACH LINE.

Approximate interval: Onset to death

IMMEDIATE CAUSE (Final disease or condition resulting in death)  HYPERTHERMIA — Due to (or as a consequence of):  1 HR 28 MINUTES

Sequentially list conditions, if any, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST — Due to (or as a consequence of):

Due to (or as a consequence of):

| 33. PART 2. ENTER OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH - BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN PART I. | 34. WAS AN AUTOPSY PERFORMED? ☒ Yes ☐ No |
|---|---|
| | 35. WERE AUTOPSY FINDINGS AVAILABLE TO COMPLETE THE CAUSE OF DEATH? ☒ Yes ☐ No |

| 36. MANNER OF DEATH | 37. DID TOBACCO USE CONTRIBUTE TO DEATH? | 38. IF FEMALE: | 39. IF TRANSPORTATION INJURY, SPECIFY: |
|---|---|---|---|
| ☐ Natural  ☒ Accident  ☐ Suicide  ☐ Homicide  ☐ Pending Investigation  ☐ Could not be determined | ☐ Yes  ☐ No  ☒ Probably  ☐ Unknown | ☐ Not pregnant within past year  ☐ Pregnant at time of death  ☐ Not pregnant, but pregnant within 42 days of death  ☐ Not pregnant, but pregnant 43 days to one year before death  ☐ Unknown if pregnant within the past year | ☐ Driver/Operator  ☐ Passenger  ☐ Pedestrian  ☒ Other  ENGINEENEER |

| 40a. DATE OF INJURY (Mo/Day/Yr) | 40b. TIME OF INJURY | 40c. INJURY AT WORK? | 40d. PLACE OF INJURY (e.g. Decedent's home, construction site, restaurant, wooded area) |
|---|---|---|---|
| 08/27/2008 | 07:00 AM | ☒ Yes ☐ No | ENGINE ROOM OF INDRA SHIP |

| 40e. LOCATION (Street and Number, City, State, Zip Code) | 40f. COUNTY OF INJURY |
|---|---|
| LIBERIAN REGISTRY SHIP, UNK | |

41. DESCRIBE HOW INJURY OCCURRED
WORKING IN HOT ENVIRONMENT (ENGINE ROOM OF SHIP)

| 42a. REGISTRAR FILE NO. | 42b. DATE RECEIVED BY LOCAL REGISTRAR | 42c. REGISTRAR |
|---|---|---|
| 021910 | 09/03/2008 | REGISTRAR - CITY OF CORPUS CHRISTI, ELECTRONICALLY FILED |

I CERTIFY THAT THIS IS A TRUE AND CORRECT reproduction of the original record as recorded in this office. Issued under authority of Section 191.051, Health and Safety Code.

VS-112 REV 1/2006

ARU

ISSUED

SEP 04 2008

GERALDINE R. HARRIS
STATE REGISTRAR

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
THE ESTATE OF VASILIJS GERASIMENKO
and LARISA GERASIMENKO,

                                 Plaintiffs,

-v-

CAPE WIND TRADING COMPANY,
LSC SHIPMANAGEMENT LTD., and
LATVIAN SHIPPING COMPANY a/k/a
JSC LATVIJAS KUGNIECIBA,

                                 Defendants.
-----------------------------------------------------------------x

09 CV

**ATTORNEY'S DECLARATION THAT DEFENDANTS CANNOT BE FOUND WITHIN THE DISTRICT**

This declaration is executed by **George M. Chalos, Esq.**, counsel for the Plaintiffs, THE ESTATE OF VASILIJS GERASIMENKO and LARISA GERASIMENKO, in order to secure the issuance of a Summons and Process of Maritime Attachment and Garnishment in the above-entitled, in personam, Admiralty cause.

Pursuant to 28 U.S.C. §1746, **George M. Chalos, Esq.**, declares under the penalty of perjury:

I am a Member of the firm of CHALOS & CO, P.C., attorneys for Plaintiffs in the above referenced matter.

I am familiar with the circumstances of the Verified Complaint, and I submit this declaration in support of Plaintiffs' request for the issuance of Process of Maritime Attachment and Garnishment of the property of the defendants, CAPE WIND TRADING COMPANY, LSC SHIPMANAGEMENT LTD., and LATVIAN SHIPPING COMPANY a/k/a JSC LATVIJAS KUGNIECIBA pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure.

Chalos & Co, P.C. Ref: 2074.001

I have personally inquired or have directed inquiries into the presence of the defendants in this District.

I have personally checked with the office of the Secretary of State of the State of New York, using the Secretary of State's Division of Corporations database, and I have determined that, as of September 21, 2009, the defendants are not incorporated pursuant to the laws of New York, and have not nominated any agent for the service of process within the Southern District of New York.

I have inquired of Verizon Telephone Company whether the defendants can be located within this District. The Verizon Telephone Company has advised me that the defendants do not have any telephone number listings within this District.

I have further consulted with several other telephone directories on the internet, and I have found no separate telephone listings or addresses for the defendants within this District.

I have engaged in a Google search as to whether the defendants can be located within this District. The Google search results did not provide any information that defendants are found in this District.

I am unaware of any general or managing agent(s) within this District for the defendants.

In that I have been able to determine that the defendants have not appointed an agent for service of process within the Southern District of New York and that I have found no indication that the defendants can be found within this District for the purposes of Rule B, I have formed a good faith belief that the defendants do not have sufficient contacts or business activities within this District and do not have any offices or agents within this District to defeat maritime attachment under Rule B of the Supplemental Rules for Admiralty and Maritime Claims as set forth in the Federal Rules of Civil Procedure.

It is my belief, based upon my own investigation that the defendants cannot be found

within this District for the purposes of Rule B of the Supplemental Rules of Certain Admiralty

and Maritime Claims of the Federal Rules of Civil Procedure.

Dated: Oyster Bay, New York
      September 21, 2009

                                      CHALOS & CO, P.C.
                                        Attorneys for Plaintiffs
                                        THE ESTATE OF VASILIJS GERASIMENKO
                                        and LARISA GERASIMENKO

By:     _____
                                        George M. Chalos (GC-8693)
                                        123 South Street
                                        Oyster Bay, New York 11771
                                        Tel: (516) 714-4300
                                        Fax: (516) 750-9051
                                        Email: gmc@chaloslaw.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
THE ESTATE OF VASILIJS GERASIMENKO
and LARISA GERASIMENKO,

                    Plaintiffs,                09 CV

-v-

                                             **VERIFICATION OF**
                                             **COMPLAINT**

CAPE WIND TRADING COMPANY,
LSC SHIPMANAGEMENT LTD., and
LATVIAN SHIPPING COMPANY a/k/a
JSC LATVIJAS KUGNIECIBA,

                          Defendants.
-----------------------------------------------------------------x

        Pursuant to 28 U.S.C. §1746, GEORGE M. CHALOS, Esq., declares under the penalty of

perjury:

        1.      I am a Member of the law firm of CHALOS & CO, P.C., counsel for the

Plaintiffs, THE ESTATE OF VASILIJS GERASIMENKO and LARISA GERASIMENKO,

herein;

        2.      I have read the foregoing Verified Complaint and know the contents thereof; and

        3.      I believe the matters to be true based on documents and information obtained

from employees and representatives of the Plaintiffs through their agents, underwriters and

attorneys.

        4.      The reason that this verification was made by deponent and not by the Plaintiffs is

because Plaintiffs are foreign citizens, whose officers are not in this district, and whose

verification cannot be obtained within the time constraints presented by the circumstances of this

case.

        I declare under penalty of perjury that the foregoing is true and correct.

Dated: Oyster Bay, New York
      September 21, 2009

                          CHALOS & CO, P.C.
                          Attorneys for Plaintiffs
                          THE ESTATE OF VASILIJS GERASIMENKO
                          and LARISA GERASIMENKO

By:          _____

                          George M. Chalos (GC-8693)
                          123 South Street
                          Oyster Bay, New York 11771
                          Tel: (516) 714-4300
                          Fax: (516) 750-9051
                          Email: gmc@chaloslaw.com